**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRUE RELIGION APPAREL, INC.; GURU DENIM, INC., | CIVIL ACTION NO. _____ |
| Plaintiffs, | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ORDER TO DISABLE CERTAIN WEBSITES, ASSET RESTRAINING ORDER, EXPEDITED DISCOVERY ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION** |
| v. | |
| XIAOKANG LEI D/B/A TRUERELIGIONJEANS4OUTLET.COM; LIN JIANYU D/B/A TRUERELIGIONJEANSOUTLET8.COM; ZHAO YANG QU D/B/A TRUERELIGION2CHEAP.COM, *et al.*, | **[FILED UNDER SEAL PURSUANT TO 15 U.S.C. § 1116]** |
| Defendants. | |

**GREENBERG TRAURIG, LLP**
**MetLife Building**
**200 Park Avenue**
**New York, NY 10166**
**Telephone: (212) 801-9200**
**Facsimile: (212) 801-6400**

*Attorneys for Plaintiffs TRUE RELIGION*
*APPAREL, INC.; GURU DENIM, INC.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 4

    A.    The TRUE RELIGION Trademarks and Products ..................................... 4

    B.    Defendants' Counterfeiting Operations ..................................................... 9

        1.    Defendants' Sales of Counterfeit Products on Infringing Websites ..................... 10

        2.    Defendants' Use of Multiple False Identities to Avoid Detection ........................ 12

 ARGUMENT ............................................................................................................. 15

I.    DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION ............................. 15

II.    TRUE RELIGION IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS ....................................................................................... 19

    A.    Defendants' Sale of Counterfeit Products Irreparably Harms True Religion's Marks, Goodwill and Business ............................................... 20

    B.    True Religion Is Likely to Prevail on Its Trademark Counterfeiting Claim .......... 21

        1.    The TRUE RELIGION Marks Are Valid and Protectable .................................. 22

        2.    Consumers Are Likely to Be Confused as to the Source of Defendants'Counterfeit Products ........................................................... 22

    C.    True Religion Is Likely to Prevail on Its Anticybersquatting Consumer Protection Act Claim ................................................................ 23

        1.    The TRUE RELIGION Marks Are Distinctive and Famous ............................... 24

        2.    The Infringing Domain Names Are Identical or Confusingly Similar to the TRUE RELIGION Marks .............................................................. 24

        3.    Defendants Have Bad Faith Intent to Profit from the TRUE RELIGION Marks ................................................................................ 25

    D.    True Religion is Likely to Prevail on Its Copyright Infringement Claim ............. 26

    E.    There Is a Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in True Religion's Favor ................................................. 27

i

III.    THIS COURT HAS THE AUTHORITY TO ISSUE AN EX PARTE ORDER ..............28

IV.    TRUE RELIGION IS ENTITLED TO AN ORDER PREVENTING
       THE TRANSFER OF DEFENDANTS' ASSETS ...........................................................32

V.     TRUE RELIGION IS ENTITLED TO EXPEDITED DISCOVERY ..............................34

VI.    SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS CASE.....................35

CONCLUSION........................................................................................................................39

NY241,533,303 v9

# TABLE OF AUTHORITIES

**Federal Cases**

*ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60 (2d Cir. 1996) ..................................... 26

*Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.,*
  No. 94 Civ. 5620, 1994 U.S. Dist. LEXIS 18457 (S.D.N.Y. Dec. 28, 1994) .......................... 33

*Ballistic Products, Inc. v. Precision Reloading, Inc.,*
  Civil No. 03-2950 ADM/AJB, 2003 U.S. Dist. LEXIS 13148 (D. Minn. July 28, 2003) ........ 30

*Banff, Ltd. v. Federated Dept. Stores Inc.,*
  841 F.2d 486 (2d Cir. 1988) ................................................................................................. 21

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
  171 F.3d 779 (2d Cir. 1999) ................................................................................................. 15

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,*
  No. 97 Civ. 4759 (SHS), 2006 U.S. Dist. LEXIS 39256 (S.D.N.Y. June 13, 2006) ............... 36

*Bensusan Restaurant Corp. v. King,*
  126 F.3d 25 (2d. Cir 1997). .......................................................................................... 14, 15

*Best Van Lines, Inc. v. Walker,*
  490 F.3d 239 (2d Cir. 2007). ............................................................................................... 16

*Bose Corp. v. Feng Chen d/b/a SellBose.com,*
  No. 11-10563-GAO (D. Mass. Apr. 11, 2011) ...................................................................... 29

*Century Home Ent., Inc. v. Laser Beat, Inc.,*
  859 F. Supp. 636 (E.D.N.Y. 1994) ....................................................................................... 31

*Chanel, Inc. v. Lin et al.,*
  No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61295 (N.D.C.A. May 7, 2010) ................. 16, 35

*Chanel, Inc. v. Zhixian,*
  2010 U.S. Dist. LEXIS 50745 (S.D. Fla. Apr. 29, 2010) ...................................................... 35

*Chloe v. Queen Bee of Beverly Hills,*
  616 F.3d 158 (2d Cir. 2010). ......................................................................................... 15, 17

*Colombia, S.A. v. Hall,*
  466 U.S. 408 (1984) ............................................................................................................ 15

*Corning Glass Works v. Jeanette Glass Co.,*
  308 F. Supp. 1321 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970) ......................... 26, 27

*NY241,533,303 v9*

*Cutco Industries, Inc. v. Naughton,*
   806 F.2d 361 (2d. Cir 1986) ........................................................... 15

*Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.,*
   604 F.2d 200 (2d Cir. 1979) ........................................................... 18

*Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.,*
   2005 U.S. Dist. LEXIS 22830 (S.D.N.Y. Sept. 6, 2005) ..................... 23

eBay, Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006) ...................................................................... 19

*El Greco Leather Prods. Co. v. Shoe World, Inc.,*
   806 F.2d 392 (2d Cir. 1986). ......................................................... 18

*Farouk Systems, Inc. v. EYOU Inte'l Trading Company, Ltd.,*
   No. 4:10-Civ-2672 (KMH) (S.D.Tex. Aug. 2, 2010) ......................... 29

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,*
   25 F.3d 119 (2d Cir. 1994) ........................................................... 18

*Ford Motor Co. v. Lapertosa,*
   126 F. Supp. 2d 463, 62 U.S.P.Q.2d 1789 (E.D. Mich. 2000) ............... 30

*Freedom Calls Found. v. Bukstel,*
   2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. Mar. 3, 2006) ..................... 24

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.,*
   286 F. Supp. 2d 284 (S.D.N.Y. 2003) ............................................. 22

*Guru Denim, Inc. v. Various John Does; Jane Does; and XYZ Companies,*
   No. 07-CV-8337 (S.D.N.Y. May 19, 2009) ...................................... 19

*Guru Denim, Inc., et al.  v. Da Urban Hut d/b/a Triangle Enterprises, LLC,*
   No. 05-CV-10077 (S.D.N.Y. Dec. 12, 2005) ................................. 19, 31

*Hamil America Inc. v. GFI,*
   193 F.3d 92 (2d Cir. 1999) ........................................................... 25

*Hanson v. Denckla,*
   357 U.S. 235 (1958) ...................................................................... 15

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,*
   780 F.2d 189 (2d Cir. 1985) ......................................................... 25

Hasbro, Inc. v. Lanard Toys, Ltd.,
   858 F.2d 70 (2d Cir. 1988). ........................................................... 19

*NY241,533,303 v9*

*ICG Am., Inc. v. Wine of the Month Club, Inc.*,
   No. 3:09-cv-133 (PCD), 2009 U.S. Dist. LEXIS 77151 (D. Conn. Aug. 28, 2009) ............... 16

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945).......................................................................................................... 15

*John Wiley & Sons, Inc. v. Swancoat*,
   No. 08 Civ. 5672 (JGK), 2009 U.S. Dist. LEXIS 71820 (S.D.N.Y. Aug. 14, 2009) .............. 18

*Levi Strauss & Co. v. Ding Shijun d/b/a LevisOnline.com*,
   No. 11 Civ. 7495 (S.D.N.Y. Oct. 24, 2011) ...................................................................... 29

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) ............................................................................................ 31

*Lipton v. Nature Co.*,
   71 F.3d 464 (2d Cir. 1995) ............................................................................................... 25

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
   631 F. Supp. 735 (S.D.N.Y. 1985) .................................................................................... 21

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
   378 F. Supp. 2d 448 (S.D.N.Y. 2005) .......................................................................... 21, 22

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
   211 F. Supp. 2d 567 (D. Pa. 2002) ................................................................................... 24

*Lucas Nursery v. Grosse*,
   359 F.3d 806 (6th Cir. 2004) ............................................................................................ 23

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*,
   264 F.3d 32 (2d Cir. 2001) ............................................................................................... 17

*Mattel, Inc. v. Internet Dimensions, Inc.*,
   55 U.S.P.Q. 2d (BNA) 1620 (S.D.N.Y. 2000)..................................................................... 24

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ............................................................................................... 17

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950).......................................................................................................... 36

*Nat'l Football League v. Chen Cheng.*,
   No. 11-Civ-00344 (S.D.N.Y. Jan. 19, 2011) ................................................................. 29, 38

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   No. 10 Civ. 1464 (CM), 2010 U.S. Dist. LEXIS 45081 (S.D.N.Y. May 4, 2010).................. 19

*Nova Products, Inc. v. Kisma Video, Inc.*,
    No. 02-Civ. 3850 (HB), 2004 WL 97692 (S.D.N.Y. Jan. 20, 2004) ....................................... 31

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*,
    175 F.3d 266 (2d Cir. 1999) .................................................................................................. 21

Paco Rabanne Parfums, S.A. v. Norco Enterps.,
    680 F.2d 891 (2d Cir. 1982) .................................................................................................. 19

*Parker Waichman Alonso v. The Orlando Firm*,
    09 Civ. 7401 (CM), 2010 U.S. Dist. LEXIS 47957 (S.D.N.Y. May 14, 2010) ....................... 17

*Phillip Morris v. Veles LTD.*,
    No. 06 CV 2988 (GBD), 2007 U.S. Dist. LEXIS 19780 (S.D.N.Y. Mar. 13, 2007).... 16, 35, 36

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961), *cert. denied*, 368 U.S. 820 (1961)....................................... 21, 22

*Prediction Co. LLC v. Rajgarhia*,
    Slip Copy, No. 09 Civ. 7459 (SAS), 2010 U.S. Dist. LEXIS 26536 (S.D.N.Y. Mar. 22,
    2010) ...................................................................................................................................... 36

*Prime Publishers, Inc. v. Am.-Republican, Inc.*,
    160 F. Supp. 2d 266 (D. Conn. 2001)..................................................................................... 24

*PRL USA Holdings, Inc. v. Tan Boon Kiat*,
    No. 10-Civ-6456 (PGG) (S.D.N.Y. Sept. 1, 2010) .................................................................. 29

*Reebok Int'l Ltd. v. Marnatech Enter.*,
    737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd*, 970 F.2d 552 (9th Cir. 1992) ......................... 31, 32

*Rio Properties, Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002) .................................................................................. 35, 36, 3379

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. Apr. 30, 2010) ....................................................................................... 19

*Softel, Inc. v. Dragon Medical & Scientific Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997) ................................................................................................... 25

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
    450 F.3d 100 (2d Cir. 2006) ................................................................................................... 15

*Technimed SRL v. Kidz-Med Inc.*,
    No. 10 Civ. 7277 (PGG), 763 F. Supp. 2d 395 (S.D.N.Y. Jan. 18, 2011)............................... 20

*The North Face Apparel Corp. v. Jun Song*,
    No. 10-Civ-5604 (LTS) (S.D.N.Y. July 23, 2010) ................................................................. 29

NY241,533,303 v9

*The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing*,
  No. 10-Civ-1630 (AKH) (S.D.N.Y. Mar. 2, 2010) ................................................. 29, 30, 32, 37

*Tishman v. The Associated Press*,
  2006 U.S. Dist. LEXIS 4622 (S.D.N.Y. Feb. 6, 2006) .............................................. 36

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) .......................................................... 20

*Tory Burch LLC v. Yong Sheng Int'l Trade Co., Ltd.*,
  No. 10-Civ-9336 (S.D.N.Y. Dec. 17, 2010) .......................................... 29

*Trans Union LLC v. Credit Research, Inc.*,
  142 F. Supp. 2d 1029 (N.D. Ill. 2001) ............................................ 30

*U2 Home Entertainment, Inc. v. Chun Pook Tan*,
  209 F. Supp. 2d 299 (S.D.N.Y. 2002) .............................................. 30

*Von Grabe v. Ziff Davis Publ'g Co.*,
  No 91 Civ. 6275 (DLC), 1994 WL 719697 (S.D.N.Y Dec. 29, 1994) ........................ 18

*Warner Bros., Inc. v. Gay Toys, Inc.*,
  658 F.2d 76 (2d Cir. 1981) ....................................................... 18

*Zippo Mfg. Co. v. Zippo DOT Com, Inc.*,
  952 F. Supp. 1119 (W.D. Pa. 1997) ............................................... 16

**Federal Statutes**

15 U.S.C. § 1057(b). ................................................................ 21

15 U.S.C. § 1114 ................................................................... 28, 31

15 U.S.C. § 1116(d)(4)(B) ........................................................... 28

15 U.S.C. § 1117 ................................................................... 33

15 U.S.C. § 1125(d). ............................................................... 23

15 U.S.C. §§ 1051 .................................................................. 1, 18

15 U.S.C. §§ 1116(d) .............................................................. 22, 29

17 U.S.C. § 410(c) ................................................................ 25

17 U.S.C. § 503 ................................................................... 30

17 U.S.C. §§ 106 .................................................................. 25

*NY241,533,303 v9*

Lanham Act (15 USC §§1116) ......................................................................... 31, 32

Pub. L. 104-153 (July 2, 1996) ........................................................................ 1

**Federal Rules**

Fed R. Civ. P. 4 .............................................................................................. 35

Fed. R. Civ. P. 30(b) ....................................................................................... 33

Fed. R. Civ. P. 64 ........................................................................................... 31

Fed. R. Civ. P. 65 ........................................................................................... 30

**Other Authorities**

4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061 (2d ed. 1987) ...................... 36

*NY241,533,303 v9*

Plaintiffs TRUE RELIGION APPAREL, INC. and GURU DENIM, INC. (collectively, "True Religion" or "Plaintiffs") submit this Memorandum of Law in support of their *ex parte* Application for a Temporary Restraining Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery Order and Order to Show Cause for Preliminary Injunction against Defendants Xiaokang Lei d/b/a truereligionjeans4outlet.com; Lin Jianyu d/b/a truereligionjeansoutlet8.com; Zhao Yang Qu d/b/a truereligion2cheap.com, *et al.* (collectively, "Defendants") for trademark counterfeiting and cybersquatting arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984), the Anti-Cybersquatting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996), and the Prioritizing Resources and Organization for Intellectual Property Act of 2007, H.R. 4279 (October 13, 2008) (the "Lanham Act"), and the Copyright Act, 17 U.S.C. §§ 501, 17 U.S.C. § 106.

## PRELIMINARY STATEMENT

Trademark counterfeiting is an illegal, multi-billion dollar business that harms both consumers, who are deceived into believing they are buying genuine goods when they are actually buying counterfeits, and brand owners, who are deprived of sales and subject to a loss of goodwill from these low-quality counterfeits bearing their marks. The Internet has made it easy for counterfeiters to conceal that the goods they are selling are fake, hide their true identities and operate under multiple false names and addresses from extra-territorial locations in an attempt to avoid liability.

True Religion is one of the most popular and widely recognized jeanswear and sportswear brands in the US. True Religion owns all rights in a large family of federally registered TRUE RELIGION trademarks. True Religion has learned that an interrelated group of counterfeiters is

selling fake True Religion jeans and other True Religion products on dozens of 'rogue' Internet websites targeting consumers in the United States, including in this Judicial District. Defendants set up their websites to appear to be authorized retailers of genuine True Religion jeans and other goods, even though investigation has revealed that they are selling counterfeit True Religion products and that they are based in China. These 'rogue' websites are written in English, accept payment in US dollars and allow payment by PayPal and/or major credit cards. Defendants often perpetuate the illusion that these websites are operated by or under the authority of True Religion by using domain names incorporating TRUE RELIGION trademarks (*e.g.,* www.truereligionjeans4outlet.com and www.truereligion2cheap.com) and copying True Religion's original and proprietary marketing images, designs and detailed product descriptions directly from True Religion's own website, such as in those 'rogue' websites pictured below:




**True Religion's Website**          **'Rogue' Website truereligion4sales.info**





**True Religion's Website**          **'Rogue' Website truereligionjeans4outlet.com**

2

Consumers are being deceived, believing they are getting 'a good deal' on genuine True Religion products rather than buying counterfeit goods. True Religion has received numerous complaints from consumers who reported purchasing what they believed were genuine True Religion jeans on these types of authentic-looking websites, only to receive counterfeit True Religion jeans.  While Defendants all claim to be selling genuine True Religion jeans, nothing could be further from the truth.  Outside investigators for True Religion have purchased forty (40) pairs of True Religion jeans, at least one from each named Defendant, and every pair of True Religion jeans received to date has been identified as counterfeit.

True Religion's outside investigators have learned that these infringing websites are being operated by, and that these counterfeit True Religion products originate from, a smaller group of interconnected counterfeiters.  In order to avoid detection, these counterfeiters are concealing their true identities and utilizing a variety of phony company names and false identities in connection with various facets of their operations.

Given such shadowy and anonymous operations, counterfeiters such as Defendants are notoriously difficult to stop.  Even when a brand owner such as True Religion challenges Defendants' sales of counterfeit goods by requesting that a particular Internet service provider remove an infringing website, Defendants lose no inventory, retain all of their profits and simply move that portion of their business to another website or move the websites to another web host or registrar.  To freeze Defendants' activities -- or at least effectively chill them -- True Religion respectfully requests that this Court issue, *ex parte*: (i) a Temporary Restraining Order and Preliminary Injunction against Defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of the counterfeit True Religion goods; (ii) an Order temporarily disabling Defendants' websites selling counterfeit True Religion goods, including those hosted at domain

3

names containing TRUE RELIGION trademarks, (iii) an Order temporarily restricting transfer of

Defendants' assets to preserve True Religion's right to an equitable accounting; (iv) an Order for

Expedited Discovery allowing True Religion to access, inspect, and copy records relating to

Defendants' manufacture, distribution and sale of the counterfeit True Religion products and

Defendants' financial accounts; and (v) an Order allowing service by electronic mail.  True

Religion does not request this relief lightly.  If the requested relief is not granted, Defendants'

intentional and unlawful counterfeiting will continue to cause irreparable harm to the reputation

and goodwill of True Religion brand symbolized by the TRUE RELIGION trademarks.

## FACTUAL BACKGROUND

A.      **The TRUE RELIGION Trademarks and Products**

The TRUE RELIGION brand was founded in 2002, by entrepreneur Jeffrey Lubell when

he sought to redefine the premium denim category.  (Declaration of Deborah E. Greaves, Esq.,

dated November 9, 2011 ("Greaves Decl."), at ¶4.)  Mr. Lubell's vision was to make quality,

American-made, authentic, timeless, great fitting, 1970's inspired jeanswear, with a trendsetting

appeal for today's consumer. (*Id*.)  Today, True Religion is known not only for its premium

jeanswear, but also for its knit and woven sportswear, accessories and other products (the "True

Religion Products"). (*Id*.)  Among the most well-known and popular of the True Religion

Products are its iconic True Religion brand jeans bearing True Religion's famous logo (the "True

Religion Design Label"):



Genuine True Religion jeanswear and many of its other True Religion Products are manufactured in the United States. (*Id.* at ¶7.) True Religion maintains strict quality control standards for all of its True Religion Products. True Religion Products are inspected and approved by True Religion or its agents prior to distribution and sale. (*Id.* at ¶8.)

Genuine True Religion Products are distributed and sold in over one hundred True Religion owned boutiques in the United States, as well as internationally in True Religion boutiques located in Canada, Japan, Germany and the United Kingdom and through True Religion's Internet web store located at www.truereligionbrandjeans.com (the "True Religion Web Store"), as well as other authorized online web stores, from which a significant portion of sales of True Religion Products are made. (*Id.* at ¶¶ 9-10.) The True Religion Web Store features the TRUE RELIGION Marks as indicators of authenticity as well as other proprietary images and designs, including images of True Religion Products. (*Id.* at ¶¶ 10-11, **Exhibit B**) True Religion has devoted and continues to devote a great deal of time and resources to creating these images and designs. (*Id.*) The True Religion Web Store is extremely popular, enjoying more than 500,000 unique visitors per month. (*Id.* at ¶10.)

True Religion is the owner of a well-established family of famous trademarks, including, *inter alia*, TRUE RELIGION,   , and  for use with its collection of jeanswear, sportswear, accessories and other products (collectively, the "TRUE RELIGION Marks"). (*Id.* at ¶11.) True Religion is the owner of numerous federal trademark and service mark registrations with the U.S. Patent and Trademark Office for the TRUE RELIGION Marks, including, *inter alia*, the following federal registrations:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 2,917,187 |  | LABEL FOR CLOTHING, NAMELY, MEN'S, WOMEN'S, AND CHILDREN'S PANTS, SLACKS, JEANS, SHORTS, OVERALLS, SHIRTS, T-SHIRTS, BLOUSES, VESTS, SKIRTS, JACKETS, SWEATERS, SWEATSHIRTS, SWEATPANTS, AND HATS, CLASS 25. |
| 3,162,615 | TRUE RELIGION | ON-LINE RETAIL STORE SERVICES FEATURING CLOTHING; RETAIL STORE SERVICES FEATURING CLOTHING, CLASS 35. |
| 3,120,798 | TRUE RELIGION BRAND JEANS | ON-LINE RETAIL STORE SERVICES FEATURING CLOTHING; RETAIL STORE SERVICES FEATURING CLOTHING, CLASS 35. |
| 3,147,244 |  | PANTS, JEANS, JACKETS, SHORTS AND  SKIRTS, CLASS 25. |
| 3,482,001 |  | CLOTHING, NAMELY, MEN'S, WOMEN'S, AND CHILDREN'S PANTS, JEANS, SHORTS, OVERALLS, SHIRTS, T-SHIRTS, BLOUSES, VESTS, SKIRTS, JACKETS, COATS, SWEATERS, SWEATSHIRTS, SWEATPANTS, HATS, BELTS AND SHOES, CLASS 25. |
| 3,490,283 |  | PANTS, JEANS, SHORTS, OVERALLS, SHIRTS, T-SHIRTS, VESTS, SKIRTS, JACKETS, SWEATSHIRTS, SWEATPANTS, DRESSES, HOODED SWEATSHIRTS, TOPS, BLOUSES AND FOOTWEAR, CLASS 25. |

6

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 3,561,465 |  | PANTS, JEANS, CLASS 25. |
| 3,561,466 |  | PANTS, JEANS AND JACKETS AND SHORTS, CLASS 25. |
| 3,561,705 |  | APPAREL, NAMELY, JEANS, PANTS, SKIRTS, SHORTS, JACKETS, CLASS 25. |
| 3,561,710 |  | APPAREL, NAMELY, JEANS, PANTS, SKIRTS, SHORTS, HATS, FOOTWEAR, CLASS 25. |
| 3,607,799 |  | BATHING SUITS, BATHING TRUNKS, BEACHWEAR, BIKINIS, BLOUSES, BOOTS, CAPS, COATS, DRESSES, FOOTWEAR, HATS, HEADWEAR, JACKETS, JEANS, NECKWEAR, PANTS, SANDALS, SCARVES, SHAWLS, SHIRTS, SHOES, SHORTS, SKIRTS, SNEAKERS, SWEAT PANTS, SWEATSHIRTS, SWIMWEAR, T-SHIRTS, TOPS, TANK TOPS, VESTS, CLASS 25. |

7

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 3,978,250 |  | ADVERTISING VIA ELECTRONIC MEDIA AND SPECIFICALLY THE INTERNET; ON-LINE RETAIL STORE SERVICES FEATURING APPAREL, FOOTWEAR AND FASHION ACCESSORIES; WHOLESALE AND RETAIL STORE SERVICES FEATURING APPAREL, FOOTWEAR AND FASHION ACCESSORIES, CLASS 35. |

True and correct copies of the federal trademark registrations for the TRUE RELIGION Marks are attached to the Complaint as **Exhibit A**.   All of the TRUE RELIGION Marks are valid, subsisting, unrevoked, and uncancelled.  In addition, True Religion has developed common law rights in the aforementioned marks.  (Greaves Decl. at ¶11.)

In addition to the TRUE RELIGION Marks, True Religion owns copyrights in numerous original visual arts and text works, many of which have been registered with the United States Copyright Office.  In addition to owning a federal trademark registration for the True Religion Design Label (Registration No. 2,917,187),  True Religion also owns a copyright registration in the True Religion Design Label as an original visual work  (Copyright Reg. No. VA 1,698,310).  (*Id*. at ¶12.)  In addition, True Religion has applied for and received Certificates of Registration with the United States Copyright Office (Copyright Reg. Nos. TX 6,236,806 and TX 7,243,590) for original text, images and layout on the True Religion Web Store (collectively, with the True Religion Design Label, the "True Religion Copyrights"). (*Id.*)  True and correct records of these copyright registrations from the United States Copyright Office are attached as **Exhibit B** to the Complaint, filed herewith.

True Religion displays its TRUE RELIGION Marks and True Religion Products in its advertising and promotional materials. (*Id.* at ¶14.)  To date, True Religion has spent millions of dollars in advertising and promoting the TRUE RELIGION Marks and True Religion Products, which has resulted in substantial sales of True Religion Products and invaluable goodwill for the TRUE RELIGION brand. (*Id.* at ¶14.)

The continuous and broad use of the TRUE RELIGION Marks in connection with True Religion Products, as well as the prominent use of these marks in advertising and marketing, has enabled True Religion to achieve widespread fame, and has made the TRUE RELIGION Marks themselves among the most famous and widely-recognized marks in the fashion industry. (*Id.* at ¶15.)  Consumers, potential customers and other members of the public and fashion industry not only associate True Religion Products with high-quality materials, style and workmanship, but also recognize that True Religion Products originate exclusively with True Religion. (*Id.* at ¶15.)

Consequently, True Religion has acquired and enjoys an outstanding reputation and significant goodwill associated with the TRUE RELIGION Marks on the True Religion Products, and the TRUE RELIGION Marks are thus invaluable assets to True Religion. (*Id.* at ¶16.)  Given the enormous value of the TRUE RELIGION Marks and True Religion Copyrights, True Religion makes great efforts to combat the distribution and sale of counterfeit True Religion Products. (*Id.*)

### B.    Defendants' Counterfeiting Operations

With absolutely no authorization from True Religion, Defendants, an interrelated group of anonymous counterfeiters, are manufacturing, distributing, importing, offering to sell and selling over the Internet counterfeit versions of True Religion Products bearing the TRUE RELIGION Marks to consumers in New York and elsewhere in the US.  Defendants'

9

counterfeiting activities are deceiving consumers, who believe they are buying genuine True Religion Products rather than fakes, and causing irreparable harm to Plaintiffs' True Religion brand.

1.      Defendants' Sales of Counterfeit Products on Infringing Websites

Defendants have established dozens of different stand-alone websites and/or selling pages on business-to-business and business-to-consumer websites (collectively, the "Infringing Websites")  to sell counterfeit True Religion Products, bearing identical copies of the TRUE RELIGION Marks, including the True Religion Design Label ("Counterfeit Products") (Declaration of Matthew N. Hewlett, dated November 10, 2011 ("Hewlett Decl."), at ¶¶6-9.) These Infringing Websites are designed to appear to unknowing consumers to be legitimate US-based web stores authorized to sell genuine True Religion Products. (*Id.* at ¶7.)  These websites are sophisticated-looking, written in English, accept payment in US dollars and allow payment through PayPal and/or major credit cards. (*Id.* ¶7, **Exhibit A**.)  These sites copy the True Religion Copyrights, namely,  proprietary images and designs and  actual photos of True Religion Products directly from the True Religion Web Store in order to appear to be authorized True Religion websites. (*Id.*; Greaves Decl. **Exhibit B**.)

In order to further deceive customers and so that their sites will rank high on any web browser searches for "True Religion," Defendants have set up a number of the Infringing Websites at domain names containing the TRUE RELIGION Marks.  (Hewlett Decl. at ¶9.)  The following is a list of fifty eight (58) domain names (the "Infringing Domain Names") containing the TRUE RELIGION Marks that Defendants have registered and are using in bad faith in connection with their Infringing Websites and to sell Counterfeit Products:

| 1. | truereligionjeans4outlet.com | 30. cheapertruereligionjeans.com |
| 2. | truereligionjeans2sale.com | 31. truereligionoutlet-sale.com |

3.      truereligion4outlet.com

4.      truereligionjeansoutlet8.com

5.      cheaptruereligionjeanssale.org

6.      cheaptruereligionjeans2.com

7.      truereligionoutlet3.com

8.      truereligionoutlet8.com

9.      truereligionjeanssales.com

10.     cheaptruereligion8.com

11.     toptruereligionjeans.com

12.     fortruereligionjeans.com

13.     truereligionsale.co.uk

14.     cheaptruereligion.co.uk

15.     truereligion2cheap.com

16.     truereligion-cheap.com

17.     truereligion2sale.com

18.     truereligionlike.com

19.     cheapertruereligionjeans.net

20.     cheaptruereligionjeans2u.com

21.     cheaptruereligionjeans2011.com

22.     truereligionoutletusa.com

23.     cheaptruereligionjeans-sale.com

24.     truereligionjeansbox.com

25.     truereligionjeans4sale.com

26.     mycheaptruereligionjeans.com

27.     cheaptruereligionjeansoutlets.com

28.     cheaptruereligionjeansoutlets.net

29.     buytruereligionjeans.net

32.     truereligionsoutlets2011.net

33.     jeans-true-religions.com

34.     truereligionjeansbox.com

35.     truereligionjeans-outlets1.info

36.     cheaptrue-religionjeans.com

37.     cheaptruereligionjeanssale.net

38.     true-religion-jeans-outlet.com

39.     cheapjeanstruereligion.info

40.     cheaptruereligionsjeans.info

41.     saletruereligionsjeans.info

42.     truereligionjeans-outlet.cc

43.     truereligionjeans-outlet.info

44.     truereligionjeans-outlets1.info

45.     truereligion-outlet.cc

46.     truereligionoutletjeans.info

47.     truereligion-outletjeans.info

48.     truereligionoutletjeans.cc

49.     truereligionjeanssale.cc

50.     truereligionoutlet.cc

51.     jeans-true-religion.com

52.     truereligionoutletjeans-new.info

53.     jeans-true-religions.com

54.     truereligionbrandjeansstore.com

55.     cheaptruereligionjeanssale.net

56.     cheaptrue-religionjeans.com

57.     cheap-true-religion-jeans.com

58.     truereligion4sale.com

Defendants claim to sell genuine True Religion Products, but, in fact, the True Religion

Products they sell are counterfeit. (*Id.* at ¶¶7-9.)  In the course of this investigation, outside

investigators for True Religion have purchased forty (40) pairs of jeans, at least one from each

named Defendant, each sold as a pair of genuine True Religion jeans. (*Id.* at ¶11.)  As of the date

of this filing, investigators have received thirty-four (34) of these purchases, and every one has

been identified as a Counterfeit Product. (*Id.* at ¶¶ 12-13.)  These Counterfeit Products bear

similar irregularities and indicia of being counterfeit to one another, indicating that the

Counterfeit Products were manufactured by and come from common sources and that

11

Defendants are interrelated. (*Id.* at ¶¶ 14, 16.)  The True Religion Products that Defendants are selling can be identified as counterfeit in other ways, including the following: 1) True Religion jeans are manufactured in the United States and the Counterfeit Products are being offered from China, 2) none of the Infringing Websites are authorized manufacturers, distributors or sellers of True Religion Products, 3) many of the alleged True Religion Products offered on the Infringing Websites can be identified as counterfeit based on the photographs of the products alone, and 4) the prices and quantities of the True Religion Products offered on the Infringing Websites indicate they are counterfeit. (Greaves Decl. at ¶ 21.)

      2.      Defendants' Use of Multiple False Identities to Avoid Detection

Defendants, knowing that their activities are illegal, are concealing their identities and using demonstrably false names and incomplete identification information in connection with their operation of the Infringing Websites, and in all other facets of their operations in order to avoid detection.  Defendants' Infringing Websites are devoid of any identifiable names or addresses of Defendants. (Hewlett Decl. at ¶8.)  Defendants communicate with potential customers exclusively via the Infringing Websites and/or by email without revealing their true identities. (*Id.* at. ¶¶ 10, 17.)  When Defendants must provide an identity, such as on a shipping label or a domain name registration, they instead provide false or incomplete names and addresses. (*Id.* ¶¶ 17, 21-24.)  The Internet Corporation for Assigned Names and Numbers (ICANN), the body that governs domain names, requires all who register domain names to provide accurate registration information, which is compiled in a network of publicly-available databases commonly referred to as "WhoIs." (*Id.* at ¶23, **Exhibit F**.)  In Defendants' domain name registrations, as visible in the WhoIs database, Defendants' listed names and addresses are incomplete, nonsense, randomly-typed letters, or street addresses with no cities or states listed.

(*Id.*)   For example, the contact information listed for the domain name truereligionjeans4outlet.com, one of the Infringing Domain Names, is "Xiaokang Lei bei jing hai dian qu   yu yuan tan nan lu pu hui bei li 40 hao."  (*Id.* at ¶¶ 25-26, **Exhibit B**.)  True Religion's investigators have been unable to verify any of the names and addresses in Defendants' domain name registration as being genuine. (*Id.* ¶¶ 26-29.)

Defendants uniformly use separate false identities in connection with their shipments of Counterfeit Products to the US to avoid detection and liability for counterfeiting by US Customs and Border Protection ("CBP") and/or by brand owners.  All of the purchases received to date in True Religion's investigation were shipped from China via China Courier Service Corporation's Express Mail Service ("EMS"), except for one which arrived by China Post. (*Id.* at ¶18.)  These goods all arrived in similar packages with similar markings to one another, suggesting that many of them come from common or related sources. (*Id.*)  CBP regulations requires that all packages entering the US from another country be accompanied by a Declaration Form CN22 or Declaration Form CN23 (for commercial shipments) that must be completed in English. (*Id.* at ¶19; Hewlett Decl. **Exhibit D**.)  The CN22 Declaration, which is incorporated into the EMS waybill, requires the sender to accurately state its name and address in English as well as and the contents of the package and to sign a declaration that the package does not contain "dangerous and or prohibited goods." (*Id.* at ¶20.)  The EMS waybill also contains the following instruction in English and Chinese: "FOR PARCEL, PLEASE FILL IN THE DECLARATION FORM CN23, PROVIDE COMMERCIAL INVOICE OR PRO FORMA INVOICE AND CAREFULLY COMPLETE THE FORM BELOW IN ENGLISH." (*Id.*)

In every one of the thirty-four (34) parcels containing Counterfeit Products received to date, the Defendants' CBP declaration requirements appear to be incomplete in the following

13

ways: a) the CBP Declaration Form 22 does not contain a discernable or accurate return name and address of the sender, b) the CBP Declaration Form CN22 does not identify the true contents of the package, instead claiming the package contains something else such as "shoes of cloth," "family gift," or "personal items," c) the parcel was not accompanied by the required CBP Declaration Form CN23, and d) the parcel was not accompanied by the required commercial invoice. (Hewlett Decl. at ¶21.)  Additionally, on the vast majority of Defendants' CBP Declaration Forms CN22, the return address information is in Chinese, using Chinese characters rather than the required English, and most do not contain a signature declaring the package does not contain "dangerous and prohibited goods." (*Id.*)  In short, Defendants' *modus operandi* is to use multiple false identities in every facet of their businesses in order to avoid detection for what they know are illegal activities. (*Id.* at ¶27.)

Defendants' Counterfeit Products are not genuine, and Defendants are in no way authorized to sell the Counterfeit Products or operate the Infringing Websites. (Greaves Decl. ¶¶ 21-26.)  True Religion did not manufacture, inspect, package, or approve the Counterfeit Products.  (*Id.* at ¶26.)  The Counterfeit Products are so similar in appearance to genuine True Religion Products that consumers are being deceived, just as Defendants' intend, into believing the Counterfeit Products are genuine. (*Id.* at ¶28.)  While the Counterfeit Products have been designed to be exact copies of genuine True Religion Products and are being sold as such, they are not of the same quality as genuine True Religion Products. (*Id.* at ¶27.)  Defendants' sale of Counterfeit Products is incredibly damaging to True Religion's reputation and goodwill, and without the relief requested by True Religion's instant motion, Defendants' illegal activities will continue unabated and True Religion will continue to suffer irreparable harm. (*Id.* at ¶ 17, 29.)

14

<u>**ARGUMENT**</u>

**I.     DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION**

Defendants are all subject to personal jurisdiction in New York and in this Judicial

District.  Although Defendants are concealing their identities and operating under multiple false

identities, it appears that Defendants are all non-residents of New York and located in China.

(Hewlett Decl. ¶¶12, 18.)  Defendants have more than sufficient contacts with New York,

however, to establish personal jurisdiction in this forum based on the fact that each Defendant

operates one or more fully-interactive Internet websites and selling pages through which it offers

to sell and sells Counterfeit Products directly to customers in this Judicial District and elsewhere

in the US. (*Id*. ¶8.)

Personal jurisdiction over a non-resident defendant is determined by the law of the

jurisdiction where the federal court sits, in this case by New York law. *See Bensusan Restaurant

Corp. v. King*, 126 F.3d 25, 27 (2d. Cir 1997).  Because New York does not extend personal

jurisdiction to the full extent permitted under the Due Process Clause of the US Constitution, a

two-fold inquiry is required: (1) whether New York's Civil Practice Law and Rules provides for

jurisdiction in this action and (2) whether exercising jurisdiction comports with the due process.

*See id.*; *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  True Religion asserts "specific"

jurisdiction over Defendants as Defendants' contacts with New York are that the same

counterfeiting activities that are the subject of this action.  *Helicopteros Nacionales de

Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8 (1984).

Under New York's long arm statute, each Defendant is subject to personal jurisdiction

under C.P.L.R. § 302(a)(1) because each has offered and supplied counterfeit goods in New

York.[1]  Jurisdiction is appropriate under § 302(a)(1) when a defendant "purposefully avails itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d. Cir 1986), *quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Furthermore, a "defendant need not be physically present in New York to transact business there within the meaning…of § 302(a)(1)." *Chloe v. Queen Bee of Beverly Hills*, 616 F.3d 158 (2d Cir. 2010).  Not only does each Defendant, through its one or more Infringing Websites or selling pages, offer to ship genuine True Religion Products to any address in the United States, including New York, each Defendant has actually shipped at least one Counterfeit Product to New York as part of the investigation leading up to this action. (Hewlett Decl. ¶¶11-12). A single transaction, such as each Defendant's sale and shipment of a Counterfeit Product to New York, is sufficient to support personal jurisdiction if "the relevant cause of action also arises from that transaction." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999); s*ee also Chloe*, 616 F.3d at 169.

Additionally, Defendants transact business in New York because each Defendant sells and offers to sell Counterfeit Products via one or more fully interactive Internet websites accessible in this Judicial District, giving rise to personal jurisdiction under C.P.L.R. § 302(a)(1). The Second Circuit, like many jurisdictions, has recognized the district court's analysis in *Zippo Mfg. Co. v. Zippo DOT Com, Inc*., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) to determine personal jurisdiction based on a website's interactivity, to be "useful for analyzing personal jurisdiction under § 302(a)(1) … insofar as it helps to decide whether the defendant 'transacts any business' in New York." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir. 2007).

---

[1] Defendants are also subject to personal jurisdiction based on C.P.L.R. § 302(a)(3)(ii) because each has committed tortious acts of trademark counterfeiting causing injury in New York.  *See, e.g, Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006).

Under the *Zippo* test, which measures the "nature and quality of commercial activity" of a website, personal jurisdiction is proper when a non-resident, doing business over the Internet, enters into contracts with residents of a particular state which "involve the knowing and repeated transmission of computer files over the Internet." *Zippo Mfg*, 952 F. Supp. at 1124. Accordingly, courts routinely find that that defendants who sell counterfeit goods on fully-interactive websites are subject to personal jurisdiction. *See, e.g.*, *Phillip Morris v. Veles LTD.*, No. 06 CV 2988 (GBD), 2007 U.S. Dist. LEXIS 19780 (S.D.N.Y. Mar. 13, 2007); *ICG Am., Inc. v. Wine of the Month Club, Inc.*, No. 3:09-cv-133 (PCD), 2009 U.S. Dist. LEXIS 77151, at *10-11 (D. Conn. Aug. 28, 2009)("[i]nteractive, commercial websites permit personal jurisdiction to be exercised over a defendant"); *Chanel, Inc. v. Lin et al.*, No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61295, at *17 (N.D. Cal. May 7, 2010)("[p]ersonal jurisdiction is appropriate where an entity is conducting business over the internet and has offered for sale and sold its products to forum residents"). In *Chloe v. Queen Bee*, the Second Circuit recently found jurisdiction over a non-resident online counterfeiter, concluding that the defendant had "transacted business within the state under § 302(a)(1)" based on its sale and shipment of at least one counterfeit handbag in to New York and its operation of a highly interactive website that offered to sell and sold counterfeit goods anywhere in the US, including New York. *Chloe*, 616 F.3d at 169. In the case at hand, each Defendant is transacting business in New York by operating at least one Infringing Website, written in English, allowing customers to complete the purchase of what it claims to be genuine True Religion Products over the Internet in US dollars using PayPal and/or major credit cards and have such purchase shipped to any address in the US, including New York. (Hewlett Decl. ¶¶8, 11-12).

The second part of the showing personal inquiry, whether there is due process, contains two parts, the minimum contacts inquiry and the reasonableness inquiry. *See Parker Waichman Alonso v. The Orlando Firm*, 09 Civ. 7401 (CM), 2010 U.S. Dist. LEXIS 47957, at *6 (S.D.N.Y. May 14, 2010). Under the minimum contacts inquiry, courts ask whether "the claim arises out of or relates to defendants' contacts with the state," which it clearly does in this instance, given that the entire claim relates to Defendants' sales of Counterfeit Products to US and New York residents. *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 264 F.3d 32, 37 (2d Cir. 2001). The reasonableness inquiry then asks whether "defendant purposefully availed itself of the privilege of doing business in the forum so that defendant could reasonably foresee being haled into the forum's courts" and whether the assertion of jurisdiction "comports with traditional notions of fair play and substantial justice." *Id.* at 38; *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). The notions of "fair play and substantial justice" support a finding a personal jurisdiction here, as each Defendant has purposefully availed itself of doing business in New York by selling illicit products in this Judicial District and could have reasonably foreseen being subjected to jurisdiction in New York. This is particularly true here as a matter of social policy given the enormous harm to consumers and commerce caused by Defendants' counterfeiting operations, as well as the egregious nature of Defendants' attempts to avoid liability but concealing their true identities. *See, e.g., John Wiley & Sons, Inc. v. Swancoat*, No. 08 Civ. 5672 (JGK), 2009 U.S. Dist. LEXIS 71820, at *8-9 (S.D.N.Y. Aug. 14, 2009).

NY241,533,303 v9

## II.   TRUE RELIGION IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS

Once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq*., as amended (the "Lanham Act") is demonstrated, injunctive relief will readily issue. *See, e.g., Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd*., 604 F.2d 200, 205 (2d Cir. 1979); *Warner Bros., Inc. v. Gay Toys, Inc*., 658 F.2d 76, 78 (2d Cir. 1981).  The Second Circuit holds that in order to obtain preliminary injunctive relief, a movant must establish: (1) irreparable harm; and (2) either (a) probable success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation with the balance of hardships tipping decidedly in favor of the party requesting preliminary relief. *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp*., 25 F.3d 119, 122 (2d Cir. 1994); *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 206-07 (applying standard to trademark infringement); *Von Grabe v. Ziff Davis Publ'g Co*., No 91 Civ. 6275 (DLC), 1994 WL 719697, at *1 (S.D.N.Y Dec. 29, 1994).  Courts in the Second Circuit grant preliminary injunctive relief when a party's trademark rights are threatened by the sale of counterfeit versions of its products based on a trademark holder's inability "to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc*., 806 F.2d 392, 395 (2d Cir. 1986).  Courts in this District have granted True Religion *ex parte* preliminary injunctive relief against counterfeiters at least twice before.  *See Guru Denim, Inc. v. Various John Does; Jane Does; and XYZ Companies*, No. 07-CV-8337 (S.D.N.Y. May 19, 2009);  *Guru Denim, Inc., et al.  v. Da Urban Hut d/b/a Triangle Enterprises, LLC, et al.* , No. 05-CV-10077 (S.D.N.Y. Dec. 12, 2005), attached as **Exhibit A** to the Declaration of Bryn Haffey, dated November 14, 2011 ("Haffey Decl.").  As shown below, True

Religion readily meets the criteria for obtaining a temporary restraining order and preliminary injunction.

**A.     Defendants' Sale of Counterfeit Products Irreparably Harms True Religion's Marks, Goodwill and Business**

True Religion is suffering irreparable harm from Defendants' offer and sale of Counterfeit Products.  The Second Circuit has held that damage resulting from trademark counterfeiting in the form of diminished goodwill, loss of control over reputation and quality control of its products is irreparable, and has found the sale of counterfeits sufficient to establish a presumption of irreparable harm. *Paco Rabanne Parfums, S.A. v. Norco Enterps.,* 680 F.2d 891, 894 (2d Cir. 1982); *Hasbro, Inc. v. Lanard Toys, Ltd*., 858 F.2d 70, 73 (2d Cir. 1988).  In a case involving injunctive relief for copyright infringement, the Second Circuit recently abrogated the historical standard allowing a presumption of irreparable harm based on a showing of a likelihood of success on the merits.  *Salinger v. Colting,* 607 F.3d 68, 77-78 (2d Cir. 2010).  The *Salinger* Court, following *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 390-1 (2006), involving injunctive relief for patent infringement, replaced the presumption with the following test to demonstrate irreparable harm: (a) that plaintiff is likely to suffer irreparable injury in the absence of an injunction, (b) that remedies at law, such as money damages, are inadequate to compensate for that injury, (c) that the balance of hardships tips in plaintiff's favor and (d) that the public would not be disserved by the issuance of injunctive relief.  *Salinger,* 607 F.3d at 77-78, *quoting eBay, Inc.*, 547 U.S. at 390-1.  In a number of recent cases involving injunctive relief for trademark matters, this Court has applied the *Salinger* test and found irreparable harm based on plaintiff's prospective loss of goodwill and loss of control over the reputation of its mark. *See, e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, No. 10 Civ. 1464 (CM), 2010 U.S. Dist. LEXIS 45081, at *46-50 (S.D.N.Y. May 4, 2010) (citing *Tom Doherty Assocs. v.*

*Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995)) (finding irreparable harm under *Salinger* test); *The Marks Organization, Inc. v.* Joles, No. 09 Civ. 10629 (KMW), 2011 U.S. Dist. LEXIS 28182, at * 28-30 (S.D.N.Y. March 18, 2011); *Technimed SRL v. Kidz-Med Inc.*, No. 10 Civ. 7277 (PGG), 763 F. Supp. 2d 395, 402 (S.D.N.Y. Jan. 18, 2011); *United State Polo Assc'n, Inc. v. PRL USA Holdings, Inc*., No. 09 Civ. 9476 (RWS), 2011 U.S. Dist. LEXIS 51707, at *56-59 (S.D.N.Y. May 13, 2011).

True Religion has readily demonstrated it is suffering irreparable harm and meets each part of the *Salinger* test.  True Religion has demonstrated the substantial goodwill it has amassed from its TRUE RELIGION Marks as well as the irreparable injury it is suffering from Defendants' operation of Infringing Websites designed to look like genuine True Religion websites but selling Counterfeit Products that are identical in appearance to genuine True Religion Products. (*See* Greaves  Decl. ¶¶14, 16, 28-29).  Defendants' actions are causing True Religion irreparable injury by deceiving consumers, harming True Religion's goodwill in its TRUE RELIGION Marks and depriving it of sales. (*Id.*) True Religion has demonstrated that remedies at law, such as money damages, are inadequate to compensate for True Religion's injury from Defendants' counterfeiting and that the balance of hardships tips in its favor.  *See infra* at p. 14-15.  Finally, the public would not be disserved by the issuance of injunctive relief as consumers are being deceived by Defendants into purchasing what they believe are genuine True Religion Products but which are actually Counterfeit Products. (*See* Greaves Decl. ¶19.)

**B.     True Religion Is Likely to Prevail on Its Trademark Counterfeiting Claim**

To prevail on its trademark counterfeiting claims, True Religion must prove: (1) the TRUE RELIGION Marks are entitled to protection; and (2) there is a likelihood of confusion between Defendants' Counterfeit Products and genuine True Religion Products bearing the

TRUE RELIGION Marks. *See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Banff, Ltd. v. Federated Dept. Stores Inc.*, 841 F.2d 486, 489-90 (2d Cir. 1988); *see also Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005).

1.      The TRUE RELIGION Marks Are Valid and Protectable

Through its pleadings, True Religion has established that it is the owner of all right, title and interest in and to its TRUE RELIGION Marks in connection with the same type of goods and services being counterfeited by Defendants, namely True Religion jeanswear, sportswear, accessories and other goods.  *Supra* at pp. 4-8.  True Religion has demonstrated that its marks are the subject of multiple federal trademark registrations.  (Greaves Decl. ¶¶ 11-13.) These registrations are *prima facie* evidence of the validity of the TRUE RELIGION Marks, as well as True Religion's exclusive right to use its marks in commerce and in connection with the goods or services specified in the registrations.  *See* 15 U.S.C. § 1057(b).  *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735 (S.D.N.Y. 1985).

2.      Consumers Are Likely to Be Confused as to the Source of Defendants' Counterfeit Products

In the Second Circuit, likelihood of confusion is assessed by the factors enunciated in *Polaroid Corp. v. Polarad Elecs. Corp.* 287 F.2d 492, 495-96 (2d Cir. 1961), *cert. denied*, 368 U.S. 820 (1961); *see also Banff, Ltd.*, 841 F.2d at 489-90.  Here, each of the eight, non-exhaustive *Polaroid* factors used to analyze whether there is likelihood of confusion favor True Religion: (1) the strength of the TRUE RELIGION Marks; (2) the degree of similarity between the TRUE RELIGION Marks and Defendants' marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) the sophistication of the buyers; (6) the quality of the Defendants' products; (7) actual confusion; and (8) the Defendants' intent in using

22

the trademarks in question.  *See Polaroid Corp.*, 287 F.2d at 495.  Furthermore, this Court has

held that, "where counterfeit marks are involved, it is not necessary to perform the step-by-step

examination of each *Polaroid* factor because counterfeit marks are inherently confusing."

*Lorillard Tobacco*, 378 F. Supp. 2d at 455; *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,

286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).  A counterfeit mark is defined in the Lanham Act as

a "spurious mark which is identical with, or substantially indistinguishable from, a registered

mark" on the Principal Register of the United States Patent and Trademark Office, used by an

unauthorized producer.  *See* 15 U.S.C. §§ 1116(d) and 1127.  True Religion has established that:

(1) the marks used by Defendants on the Counterfeit Products are identical to or substantially

indistinguishable from the TRUE RELIGION Marks which True Religion is using in commerce

on its genuine True Religion Products; and (2) Defendants' use of the TRUE RELIGION Marks

on the Counterfeit Products is not authorized by True Religion. *Supra* at pp. 8-9; 13.

Additionally,   True Religion  has learned that consumers are, in fact, being deceived

by purchasing what they believe are genuine True Religion Products from these Infringing

Websites, only to learn when the goods arrive that they have purchased lower-quality Counterfeit

Products. (Greaves Decl. ¶19).  As such, True Religion has demonstrated that consumers are

likely to be confused as to the source of Defendants' Counterfeit Products and that consumers

are actually being confused by Defendants' sale of Counterfeit Products on the Infringing

Websites.

> **C.    True Religion Is Likely to Prevail on Its**
> **Anticybersquatting Consumer Protection Act Claim**

The Anticybersquatting Consumer Protection Act of 1996 ("ACPA") is applicable in

instances when a domain name registrant has a bad faith intent to profit by "cybersquatting" a

domain name that "is identical or confusingly similar to or dilutive of" the distinctive or famous

mark of another. 15 U.S.C. § 1125(d).  Courts have often stated that one of the focuses of the

ACPA is to address counterfeit sellers who "register well-known marks to prey on consumer

confusion by misusing the domain name to divert customers from the mark owner's site to the

cybersquatter's own site, and target distinctive marks to defraud consumers." *Lucas Nursery v.

Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); *see also Diarama Trading Co., Inc. v. J. Walter

Thompson U.S.A., Inc.*, 2005 U.S. Dist. LEXIS 22830, at *2-3 (S.D.N.Y. Sept. 6, 2005).

Defendants are doing just that, having registered and are using dozens of domain names

containing the TRUE RELIGION Marks to divert consumers to Infringing Websites where they

sell Counterfeit Products.  Defendants have registered and are using at least the fifty-eight (58)

previously-identified Infringing Domain Names containing the TRUE RELIGION Marks to sell

Counterfeit Products.  In order to prevail on its ACPA claim, True Religion must show that (1)

its marks are distinctive and famous, (2) Defendants have registered domain names containing

the identical marks and (3) Defendants are acting in bad faith.  *Mattel, Inc. v. Internet

Dimensions, Inc.*, 55 U.S.P.Q. 2d (BNA) 1620, 1621-22 (S.D.N.Y. 2000).

    1.    The TRUE RELIGION Marks Are Distinctive and Famous

As detailed earlier, True Religion's well-established TRUE RELIGION Marks are

closely linked with True Religion's success, as these marks one of the most popular jeanswear

brands in the US.  (Greaves Decl. ¶¶4-6).  As a result, the TRUE RELIGION Marks have a high

degree of acquired distinctiveness, and, in turn, True Religion is likely to succeed in showing

that its TRUE RELIGION Marks are distinctive or famous.

    2.    The Infringing Domain Names Are Identical or
            Confusingly Similar to the TRUE RELIGION Marks

The Infringing Domain Names are identical or confusingly similar to the TRUE

RELIGION Marks, as they each contain True Religion mark TRUE RELIGION in its entirety.

The inclusion of a plaintiff's trademark combined with usage of the mark on the website in question has been held to be sufficient for a finding of confusing similarity for ACPA purposes. *Mattel, Inc.*, 55 U.S.P.Q. 2d 1620.  Courts have found that the addition of generic or geographic terms, such as 'buy,' 'sales,' 'store,' or 'online,' are not sufficient to distinguish the domain name from a protected mark that it contains.  *See, e.g., Prime Publishers, Inc. v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 279-280 (D. Conn. 2001); *Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, at *40-41 (E.D.N.Y. Mar. 3, 2006).  The fact that the entire trademark TRUE RELIGION appears without alteration in all of these domain names and each is used in connection with the sale of counterfeit True Religion Products is sufficient to show that these Infringing Domain Names are identical and or confusingly similar to the TRUE RELIGION Marks.

3.      Defendants Have Bad Faith Intent to Profit from the TRUE RELIGION Marks

Courts have held that the registration of a trademark owner's mark as part of a domain name used to sell counterfeit versions of the trademark owner's goods is a particularly egregious form of bad faith.  *See, e.g.*, *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 584-585 (D. Pa. 2002).  Bad faith could hardly be more clear than in a case like this, where Defendants are using the TRUE RELIGION Marks in domain names used for the Infringing Websites masquerading as authentic sources of True Religion Products but are in fact selling Counterfeit Products.  The Court should not hesitate to find True Religion likely to succeed under its ACPA claims.  In such cases, in addition to other damages, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."  *Id.*

### D.       True Religion is Likely to Prevail on Its Copyright Infringement Claim

Defendants' unauthorized use of True Religion's proprietary works, including its copyrighted True Religion  Design Label on Counterfeit Products constitutes copyright infringement.  A copyright owner establishes a prima facie case of copyright infringement by demonstrating (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant.  *ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 64 (2d Cir. 1996); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985).  True Religion owns copyright registrations for its True Religion  Design Label and images, photographs and text from the True Religion Web Store, which constitutes *prima facie* evidence that True Religion is the owner of a valid copyrights in these work.  *See* 17 U.S.C. § 410(c).  Defendants have infringed the True Religion Design Label by copying and distributing Counterfeit Products that bear the exact copies of this original work.  (Hewlett Decl. ¶¶ 6-8; 10-16; Exhs. A, C.)  *See* 17 U.S.C. §§ 106, 501 (a).  Copying is proved by showing that (1) the defendant had access to the plaintiff's copyrighted work and (2) the defendant's work is substantially similar to the plaintiff's copyrighted work.  *See Hamil America Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999); *Softel, Inc. v. Dragon Medical & Scientific Commc'ns, Inc.*, 118 F.3d 955, 963 (2d Cir. 1997).  There can be no question Defendants had access to the True Religion Design Label, as Defendants are currently are selling Counterfeit Products designed to look identical to the True Religion Products including identical reproductions of True Religion Design Label.  Moreover, if the works are "so strikingly similar as to preclude the possibility of independent creation, 'copying' may be proved without a showing of access."  *Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir. 1995).  Substantial similarity exists when the "average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Hamil*, 193 F.3d at 100.

26

Defendants' Counterfeit Products bear exact copies of the True Religion Design Label.  (Hewlett Decl., **Exhibit C**.)  True Religion is therefore likely to prevail on the merits of its copyright infringement claim.

        **E.**       **There Is a Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in True Religion's Favor**

True Religion strongly believes it has established the required likelihood of success as to Defendants' liability for trademark counterfeiting and cybersquatting under the Lanham Act. However, should this Court not find such likelihood of success on the merits, True Religion respectfully submits that it has at least raised serious questions going to the merits of its claims, and that the balance of hardships tips decidedly in True Religion's favor.

For the same reasons that True Religion is likely to prevail on its claims, True Religion has raised serious questions for which there is a fair ground for litigation.  This Court must then balance True Religion's harm from the wrongful denial of a Temporary Restraining Order and Preliminary Injunction against any harm Defendants may suffer from granting an injunction that would not be cured by prevailing on the merits and recovering on the injunction bond that True Religion is required to post in conjunction with its request for injunctive relief.  As set forth above, the harm to True Religion is irreparable.  The continued unauthorized use by Defendants of the TRUE RELIGION Marks on Counterfeit Products further threatens True Religion's reputation, its ability to control the quality and appearance of products bearing its marks, and the value of its as a designation of source.  The potential harm to Defendants, on the other hand, is purely monetary.  Defendants have no legitimate interest in selling Counterfeit Products or otherwise using the TRUE RELIGION Marks without True Religion's permission.  Given "the probable outcome of this action, this is a loss which [Defendants] may justifiably be called upon

NY241,533,303 v9

to bear." *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

## III.    THIS COURT HAS THE AUTHORITY TO ISSUE AN *EX PARTE* ORDER

True Religion requests this relief *ex parte* because experience in other cases has shown that, if given notice, defendants will simply shift financial accounts and ISPs, adopt new false identities and proceed with their counterfeiting unimpeded. (Hewlett Decl. ¶29.)  The need for *ex parte* relief is especially great in today's global economy where counterfeiters have all of the advantages of anonymity provided by the Internet.  Without the requested relief, neither this Court nor True Religion will be able to prevent the disappearance or destruction of crucial evidence that would enable True Religion to track the sources of these Counterfeit Products. True Religion is currently unaware of the true identities and locations of the Defendants, the location of other Infringing Websites that may be operated by Defendants, or the location of the Counterfeit Products that are being readied for distribution. (*Id.* ¶28.)  It is vital that True Religion immediately obtain information concerning Defendants' sources, distribution network, and flow of profits to minimize future irreparable harm.

This Court's authority to issue the *ex parte* Restraining Order requested is specifically mandated by § 34 of the Lanham Act. 15 U.S.C. § 1116.  Congress's purpose in adopting the Trademark Counterfeiting Act in 1984 to provide for *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters given prior notice of an action from disappearing or quickly disposing of existing inventory of counterfeit items and the records relating to their manufacture and distribution. Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984.)  This risk of counterfeiters disappearing or changing

28

their operations if given prior notice is obviously greater today given that counterfeiters are operating exclusively on the Internet and  using false identities.

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* Order is appropriate upon a showing that: (i) the applicant trademark owner obtaining the order will provide adequate security; (ii) an order other than an *ex parte* Order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant trademark owner is likely to succeed in showing the defendants are using counterfeit marks; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the persons against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendants, the defendants or persons acting in concert with defendant would destroy, move, hide, or otherwise make such materials inaccessible to the Court.  *See* 15 U.S.C. § 1116(d)(4)(B).

Given that this case involves a ring of anonymous counterfeiters doing business only over the Internet, this lawsuit would be an exercise in futility, without the requested *ex parte* relief. Courts comprehending the unfortunate reality of this situation, the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, now regularly issue *ex parte* Orders such as the one requested against Internet counterfeiters.[2]

---

[2]  *Levi Strauss & Co. v. Ding Shijun d/b/a LevisOnline.om*, No. 11 Civ. 7495 (S.D.N.Y. Oct. 24, 2011); *Bose Corp. v. Feng Chen d/b/a SellBose*.com, No. 11-10563-GAO (D. Mass. Apr. 11, 2011); *Nat'l Football League v. Chen Cheng.*, No. 11-Civ-00344 (S.D.N.Y. Jan. 19, 2011); *Tory Burch LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 10-Civ-9336 (S.D.N.Y. Dec. 17, 2010); *PRL USA Holdings, Inc. v. Tan Boon Kiat, et al.*, No. 10-Civ-6456 (PGG) (S.D.N.Y. Sept. 1, 2010); *Farouk Systems, Inc. v. EYOU Int'l Trading Company, Ltd.,* No. 4:10-Civ-2672 (KMH) (S.D.Tex. Aug. 2, 2010); *The North Face Apparel Corp. v. Jun Song,*  No. 10-Civ-5604 (LTS) (S.D.N.Y. July 23, 2010); *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.*, No. 10-Civ-1630 (AKH) (S.D.N.Y. Mar. 2, 2010).

29

True Religion meets each of the criteria for issuance of the request Order required by 15 U.S.C. 1116(d).[3]  True Religion has not publicized that it is seeking the relief requested in the Order. (Greaves Decl. at ¶30.)  True Religion has submitted evidence to show Defendants' extensive offer for sale and sale of Counterfeit Products on Infringing Websites and Defendants' use of the Infringing Domain Names. (Greaves Decl. at ¶¶17-29; Hewlett Decl. at ¶¶6-36.)  True Religion has established that Defendants have gone to great lengths to conceal their true identities and that they are doing business only over the Internet. (Hewlett Decl. at ¶¶19-36.)  If given notice, Defendants can easily move or destroy all records of their identities and hide all evidence of their dealings in Counterfeit Products and continue business using new identities. (*Id*. at ¶29.)  If this occurs, True Religion will suffer irreparable injury in that it will be denied access to the evidence to establish the identities of the counterfeiters and the accounting of profits to which True Religion is entitled.

Along with the other requested relief in the Order, True Religion respectfully requests an Order that domain name registries, namely VeriSign, Inc., for dot-com and dot-net domain names, NeuStar, Inc., for dot-us and dot-biz domain names, and Public Interest Registry for dot-org domain names, temporarily disable the Infringing Websites used by Defendants to host the Infringing Websites where they sell Counterfeit Products.  The use of the TRUE RELIGION Marks in the Infringing Domain Names along with the use of True Religion's proprietary images on all of the Infringing Websites is causing consumers to purchase Counterfeit Products based on the false belief that these Infringing Websites belong to and are operated in conjunction with or under the permission of True Religion.  These sales of Counterfeit Products confuse and harm

---

[3]  True Religion has indicated its willingness and ability to provide a bond to the Court in conjunction with the *ex parte* relief that it seeks.  *See* True Religion's [Proposed] Order, filed herewith.

consumers, and inflict True Religion irreparable harm upon True Religion's business and

reputation.  (Greaves Decl. ¶¶17, 29.)  *See, e.g., Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d

463, 62 U.S.P.Q.2d 1789 (E.D. Mich. 2000); *Trans Union LLC v. Credit Research, Inc,* 142 F.

Supp. 2d 1029 (N.D. Ill. 2001); *Ballistic Products, Inc. v. Precision Reloading, Inc*., Civil No.

03-2950 ADM/AJB, 2003 U.S. Dist. LEXIS 13148 (D. Minn. July 28, 2003).  Courts in this

District have recently granted  Temporary Restraining Orders in nearly identical situations,

ordering the temporary disabling of a large number of domain names being used in conjunction

with websites being used by counterfeiters to offer counterfeit goods.  *See, e.g., The North Face*

*Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.*, No. 10-Civ-1630.  (AKH)

(S.D.N.Y. March 2, 2010);  *National Football League v. Chen Cheng, et al.*, No. 11-Civ-00344

(S.D.N.Y. January 19, 2011); *Tory Burch LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 10-Civ-

9336 (S.D.N.Y. December 17, 2010), attached as **Exhibit A** to the Haffey Decl.

　　Similarly, *ex parte* seizure orders in copyright infringement actions are appropriate under

the Copyright Act to halt the further distribution of unauthorized copies.  *See* 17 U.S.C. § 503

(a).  Federal Rule of Civil Procedure 65(f) explicitly permits federal courts to apply emergency

injunctive relief to copyright proceedings.  Courts in this District and elsewhere in the Second

Circuit have granted *ex parte* seizure orders in copyright cases to seize infringing goods and

found such orders appropriate to seize business records when a plaintiff's action included both

Copyright Act and Lanham Act claims.  *See U2 Home Entertainment, Inc. v. Chun Pook Tan*,

209 F. Supp. 2d 299, 300 (S.D.N.Y. 2002); *Century Home Ent., Inc. v. Laser Beat, Inc.,* 859 F.

Supp. 636 (E.D.N.Y. 1994); *cf. Nova Products, Inc. v. Kisma Video, Inc.,* No. 02-Civ. 3850

(HB), 2004 WL 97692 (S.D.N.Y. 2004); *Antik Denim LLC; Guru Denim, Inc.; Guru Denim,*

*Inc., et al.  v. Da Urban Hut d/b/a Triangle Enterprises, LLC, et al.* , No. 05-CV-10077 (S.D.N.Y. Dec. 12, 2005).

Given the nature of Defendants' counterfeiting operations, an order other than an *ex parte* Order would be inadequate to achieve the purposes of 15 U.S.C. § 1114.  The harm to the TRUE RELIGION Marks and other intellectual property in denying the application greatly outweighs the harm to Defendants' interests in continuing to sell Counterfeit Products on Infringing Websites.  If True Religion was to proceed on notice to Defendants, given the shadowy, illicit nature of Defendants' Internet counterfeiting operations, it is clear Defendants would destroy, move, hide, or otherwise make such evidence inaccessible to the Court.  It is, thus, respectfully submitted that an *ex parte* Order is necessary to protect True Religion's trademark rights and to prevent further harm to True Religion and the consuming public.

## IV.  TRUE RELIGION IS ENTITLED TO AN ORDER PREVENTING THE TRANSFER OF DEFENDANTS' ASSETS

In addition, True Religion requests an order restraining Defendants' assets so that True Religion's right to an equitable accounting of Defendants' profits from sales of the Counterfeit Products is not impaired. Restraint can be granted pursuant to Federal Rules of Civil Procedure 64 and 65, under §§ 34 and 35 of the Lanham Act (15 USC §§1116 and 1117), and under the Court's inherent equitable power to issue provisional remedies ancillary to their authority to provide final equitable relief. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986-987 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd,* 970 F.2d 552 (9th Cir. 1992).  In the seminal case of *Reebok v. Marnatech*, a court in the U.S. District Court for the Southern District of California granted the plaintiff a limited restraint of the defendants' assets for the purpose of preserving them, thus ensuring the availability of a

meaningful accounting after trial.  The Ninth Circuit affirmed the District Court's decision stating, "[b]ecause the Lanham Act authorizes the District Court to grant [plaintiff] an accounting of [defendants'] profits as a form of final equitable relief, the District Court has the inherent power to freeze [defendants'] assets in order to ensure the availability of that final relief."  *Id.* at 559.

In the years since *Marnatech*, virtually all the federal courts, including those in this District, have granted the temporary restraint of counterfeiter's assets in cases similar to this one, including recently in actions against operators of 'rogue' websites selling counterfeit products to ensure the availability of an equitable accounting. *See, e.g., The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.*, Civil Action No. 10-Civ-1630.  (AKH) (S.D.N.Y. March 2, 2010);  *National Football League v. Chen Cheng, et al.*, No. 11-Civ-00344 (S.D.N.Y. January 19, 2011); *Tory Burch LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 10-Civ-9336 (S.D.N.Y. December 17, 2010), attached as **Exhibit A** to the Haffey Decl.

In determining whether to issue an order restraining a defendant's assets, a plaintiff must show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen. *Reebok*, 737 F. Supp. at 1524, 1527. True Religion has shown a strong likelihood of succeeding on the merits of its trademark counterfeiting claims and the irreparable harm it is suffering.  *See infra* 21-23.  Experience shows that defendants in these types of cases will otherwise ignore orders restraining assets that are issued with prior notice. (Hewlett Decl. ¶29.)  Defendants are purposefully operating anonymously on the Internet, utilizing multiple false identities, precisely to conceal themselves and their assets from detection. (*Id.* at ¶27.)  In this case, given the plethora of accounts controlled by Defendants and the ease

33

with which anonymous Defendants will be able to hide their assets if given advance notice, it is particularly important that the Court order an *ex parte* freeze of all Defendants' assets from their counterfeiting operations in order to preserve True Religion's right to an equitable accounting of profits from Defendants' sales of Counterfeit Products under 15 U.S.C. § 1117.

## V.   TRUE RELIGION IS ENTITLED TO EXPEDITED DISCOVERY

District courts have broad power to require early document production and to permit expedited discovery. *See* Fed. R. Civ. P. 30(b), 34(b).  Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury which will result without expedited discovery looms greater than the injury that defendant will suffer if expedited discovery is granted. *See, e.g., Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, No. 94 Civ. 5620, 1994 U.S. Dist. LEXIS 18457, at *7 (S.D.N.Y. Dec. 28, 1994).

As demonstrated above, True Religion is being irreparably harmed by the manufacture, importation, offering for sale, distribution, and sale of Counterfeit Products by Defendants. While True Religion has learned some aspects of Defendants' counterfeiting activities, Plaintiffs do not yet know the following with any certainty: the true identities of Defendants, the scope of Defendants' activities, the source or location of the Counterfeit Products, or where the proceeds from Defendants' counterfeiting activities have gone.  True Religion, therefore, needs to ascertain this information without delay.  Only armed with this information can True Religion seek to amend the Complaint and Temporary Restraining Order and/or Preliminary Injunction to include other individuals and entities involved in this counterfeiting operation and begin to stem the irreparable harm True Religion is suffering.

As set forth above, Defendants have gone to great lengths to conceal their true identities and/or move outside of this Court's reach by, among other things selling Counterfeit Products under false identities, using incomplete and phony return addresses on packages of Counterfeit Products they send to the US in violation of CBP regulations and using false and incomplete information in their registrations for the Infringing Domain Names.  (Hewlett Decl. ¶¶ 19-36.)

The discovery requested on an expedited basis in the proposed Order has been precisely defined and carefully limited to include only what is essential to prevent further irreparable harm, namely information relating to Defendants' true identities and identification of various websites, third party providers and financial accounts, used in conjunction with the sale of Counterfeit Products.  Discovery of these financial accounts in addition to Defendants' identities and information related to Defendants' Infringing Websites and other operations will permit True Religion to gain a full and accurate picture of Defendants' counterfeiting activities and ensure that these activities will be contained.  True Religion is unaware of any reason that Defendants or third parties cannot comply with these expedited discovery requests without undue burden.

## VI.    SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS CASE

Finally, True Religion requests the Court's permission to serve Defendants by registered electronic mail.  While Defendants are operating a highly-profitable business to sell Counterfeit Products to consumers in the US, including in this Judicial District, they are conducting business only by email and over the Internet and concealing their true identities and addresses in each of the different facets of their businesses. (Hewlettt Decl. ¶¶19-36.)  Given the purposeful anonymity of Defendants' operations, Plaintiffs' investigators have been unable discover Defendants' actual identities and physical addresses.  It would be virtually impossible to serve

Defendants unless the Court grants True Religion permission to serve by electronic mail. (Haffey Decl. ¶5.)

Fed. R. Civ. P. 4 provides flexibility in the procedures for giving defendants notice of commencement of an action in order to eliminate unnecessary technicalities in the service of process. 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061, at 216 (2d ed. 1987). Assuming Defendants are located outside of the US and in China, Plaintiffs must serve Defendants pursuant to Fed. R. Civ. P. 4(f). Fed R. Civ. P. 4(f)(3) allows this Court to authorize service of process on an individual in a foreign country by any means not prohibited by international agreement. *See Rio Properties*, *Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002); *cited by Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780, at *8 ("By design, Rule 4(f)(3), was 'adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries.'"). Both China and the United States are signatories to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters which states "[t]his Convention shall not apply where the address of the person to be served with the document is not known." Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, November 15, 1969, Article 1. (Haffey Decl., **Exhibit B**.)  In similar cases, Courts have allowed service on defendants in China by email.  *See, e.g., Chanel, Inc. v. Zhixian*, No. 10 CV 60585, 2010 U.S. Dist. LEXIS 50745 (S.D. Fla. Apr. 29, 2010); *Chanel, Inc. v. Lin et al.*, No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61295, at *11-12 (N.D.C.A. May 7, 2010).  Additionally, Fed. Civ. R. P. 4 does not require that a party attempt service of process by those methods enumerated in Fed. Civ. R. P. 4(f)(2), including by diplomatic channels, before petitioning the Court for alternative relief under Fed. Civ. R. P.

36

4(f)(3). *Rio Properties*, 284 F.3d at 1015 (holding that Rule 4(f)(3) is "an equal means of effecting service of process under the Federal Rules of Civil Procedure" and that plaintiffs need not attempt other methods of service before seeking the court's approval of alternative service under Rule 4(f)(3)).

In addition to complying with the Federal Rules of Civil Procedure, the method of service of process must comport with due process. *Rio Properties*, 284 F.3d at 1016-17; *Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780, at *5.  Due process requires that any service of notice be "reasonably calculated, under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950).  In similar cases, Courts have found that service by email is "constitutionally acceptable" to satisfy due process. *See, e.g., Rio Properties*, 284 F.3d at 1017; *Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780, at *8-9.

This Court and others have often permitted service of process by email to online businesses, especially in situations such as the case at hand where defendants are conducting illicit operations and corresponding with customers solely via the Internet and email while concealing their true physical addresses and identities. *See, e. g., Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780; *Prediction Co. LLC v. Rajgarhia*, Slip Copy, No. 09 Civ. 7459 (SAS), 2010 U.S. Dist. LEXIS 26536 (S.D.N.Y. Mar. 22, 2010); *Tishman v. The Associated Press*, 2006 U.S. Dist. LEXIS 4622 (S.D.N.Y. Feb. 6, 2006); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* No. 97 Civ. 4759 (SHS), 2006 U.S. Dist. LEXIS 39256 (S.D.N.Y. June 13, 2006).  This Court has recently allowed for service of process by email in similar cases, where anonymous defendants operating a large network of websites selling counterfeit apparel, conducted business only by email and utilized fake contact information to avoid detection.  *See,*

37

*e.g., The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.*, Civil Action No. 10-Civ-1630.  (AKH) (S.D.N.Y. March 2, 2010);  *Na'l Football League v. Chen Cheng,*  No. 11-Civ-00344 (S.D.N.Y. Jan. 19, 2011); *Tory Burch LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 10-Civ-9336 (S.D.N.Y. Dec. 17, 2010), attached as **Exhibit A** to the Haffey Decl.

Email service is also the most reliable way of putting Defendants on notice of this action. The *Rio Properties* Court found "not only that service of process by e-mail was proper—that is reasonably calculated to apprise [defendant] of the pendency of the action and afford it an opportunity to respond—but in this case, it was the method of service most likely to reach [defendant]." *Rio Properties*, 284 F.3d at 1017.  Similarly True Religion's investigators have communicated with and/or received emails from Defendants, at forty-seven (47) different email addresses. (Hewlett Decl. ¶32; **Exhibit B.**) Given that these email addresses are the ones in which Defendants conduct their illicit businesses, True Religion has every reason to believe that these email addresses are correct and that they are regularly monitored. (*Id.*)  Plaintiffs' investigators have additionally uncovered sixty-three (63) PayPal accounts used by Defendants to receive payments. (*Id.* at ¶33 **Exhibit B.**).  Each of these PayPal accounts is linked to a unique email address. (*Id.*)  In addition, investigators have identified twenty-seven (27) other email addresses appearing on the domain name registrations for the Infringing Web Sites in the WhoIs database, which might also be active email accounts used by Defendants.  True Religion proposes to send service via email to each of these one hundred and thirty-seven (137) email addresses, giving Defendants actual notice of this action many times over.  (*Id.* at ¶33 **Exhibit G.**).

In an abundance of caution, True Religion proposes using an online service, RPost (www.rpost.com), which provides valid proof of authorship, content (e-mail body and

attachments), delivery and official time sent and received.  (Haffey Decl. ¶8, **Exhibit D**.)  Thus, True Religion will be able to provide confirmation of delivery when Defendants receive email service.  Service by email would serve the interests of justice, not to mention the principles of fairness. Accordingly, the Court should grant True Religion leave to serve Defendants with the Summons and Complaint as well as this Court's Order and supporting documents via Defendants' one hundred and thirty seven (137) established email addresses.

<u>CONCLUSION</u>

Defendants' counterfeiting operations are irreparably harming True Religion and the goodwill it has built up in its TRUE RELIGION Marks.  Without entry of the requested relief, Defendants will continue to deceive consumers into believing Defendants' Counterfeit Products sold on the Infringing Websites are genuine True Religion Products, when they are not. Defendants are counting on the fact that brand owners like True Religion will, at most, challenge one or two of the vast number of Infringing Websites under their control, allowing them to switch sites and names and continue with business as usual.  The only chance True Religion has to curtail Defendants' counterfeiting ring is through a comprehensive injunction allowing for the temporarily disabling of all these Infringing Websites and cybersquatted domain names, expedited discovery and the restraint of any assets of Defendants that True Religion is able to locate.

Based upon the foregoing, True Religion respectfully requests that this Court issue, *ex parte*: (i) a Temporary Restraining Order and Preliminary Injunction against Defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of the counterfeit True Religion Products; (ii) an Order temporarily disabling those Infringing Websites including those located at  Defendants' domain names containing the TRUE RELIGION Marks, (iii) an

39

Order temporarily restricting transfer of Defendants' assets to preserve True Religion's right to

an equitable accounting; (iv) an Order for Expedited Discovery allowing True Religion to access,

inspect, and copy Defendants' records relating to the manufacture, distribution, offer of sale, and

sale of the counterfeit True Religion Products and Defendants' financial accounts; and (v) an

Order allowing service of Defendants by electronic mail.

Dated: November 15, 2011                        Respectfully submitted,


                                                GREENBERG TRAURIG, LLP

                                                By: _____

                                                Scott Gelin (gelins@gtlaw.com)
                                                Scott Thompson (thompsonse@gtlaw.com)
                                                Bryn Haffey (haffeyb@gtlaw.com)
                                                MetLife Building
                                                200 Park Avenue
                                                New York, NY 10166
                                                Telephone: (212) 801-9200
                                                Facsimile: (212) 801-6400

                                                *Attorneys for Plaintiffs TRUE RELIGION*
                                                *APPAREL, INC.; GURU DENIM, INC.*